IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

P.F., *et al.*,                                                                                    Case No. 3:15CV01923

          Plaintiffs,

      v.                                                                                                Order

Betsy Gordon, *et al.*

          Defendants.

In this 42 U.S.C. § 1983 action, plaintiffs, Mr. and Mrs. F., accuse defendants, employees of the Ottawa County, Ohio, Department of Job and Family Services (OCDJFS), of violating their procedural due process rights based on defendants' removal of their daughter, B., from their home following an allegation of sexual abuse.

Pending is defendants' motion to strike the affidavits Mr. and Mrs. F. submitted with their brief in opposition to defendants' motion for summary judgment. (Doc. 81). Plaintiffs oppose the motion (Doc. 87), and the parties have briefed the issues extensively. (Docs. 90, 91, 92, 93). For the reasons that follow, I grant the motion in part, and deny it in part.

**Background**

Mr. and Mrs. F. are the adoptive parents of B., a teenaged daughter, and foster parents to two younger children, son D. and daughter A.

On April 27, 2015, defendant Julie Barth, a supervisor in the Children's Services Division, received an intake report detailing B.'s complaint that her father sexually and physically abused her. Barth assigned the matter to defendant case worker Betsy Gordon. She and Barth reviewed the complaint and reported the matter to the Adriel School, the organization

1

through which Mr. and Mrs. F. received their foster parent licenses, and to the Ottawa County Sheriff's Office.

Barth and Gordon[1] then went to the F. home to speak with B. and her parents, accompanied by Deputy Matt Gandee (not a defendant in the action) from the Ottawa County Sheriff's Office.

B. answered the door when they arrived. Mrs. F. was at home but Mr. F. was away, attending a soccer game with A. and D.

Gordon spoke to Mrs. F. while Gandee and Barth spoke to B. privately, in a separate room. Gordon explained B.'s allegations against her father, and Mrs. F. relayed that her daughter had a history of sexual addiction and traumatization. Meanwhile, in her interview with Gandee and Barth, B. reiterated her complaints against Mr. F., which were consistent with the allegations described in her initial complaint.

At some point, Gordon stepped outside to call personnel at child welfare agencies in Lucas and Allen Counties, which held legal custody of the younger foster children. Both agencies informed Gordon that they would place A. and D. in respite care outside the home pending the outcome of the investigation into B.'s claims. Gordon also called Adriel, which worked with Allen County to find a respite care home for A., with a Mr. and Mrs. Hartlage. The Hartlages also expressed a willingness to take B. in if necessary.

Once back inside the house, Gordon spoke to Mrs. F. to determine how to proceed. What was, or was not said during their exchange is at the center of the present suit.

---

[1] Barth and Gordon decided to investigate the matter together because Gordon and B.'s father have a prior working relationship. Mr. F. is himself a licensed social worker, and a former case worker in the Children's Services Division of OCDJFS.

According to Gordon, she "explained to [Mrs. F.] what Lucas County and Allen County had decided," then expressed her "concerns about [B.] remaining in the home with [Mr. F.] during the pendency of this investigation." (Doc. 44, ID 1042). Gordon believed separating B. and Mr. F. "would protect [B.] from any other real or perceived abuse," and "protect [Mr. F.] from any further allegations." (*Id.* at 1043). It would also negate any suggestion that B. was "being coerced or intimidated" by her parents in the event that she rescinded or changed her claims. (*Id.* at 1043-44). "And given the history . . . of [B.'s] violence toward [Mr. F.], it would protect them, the parents, from any physical anger outbursts by [B.] at this time." (*Id.* at 1044).

With these issues in mind, Gordon told Mrs. F. that she had "two options: that [Mr. F.] could leave the home while the agency was investigating, or that [B.] could leave the home while the agency was investigating." (*Id.* at 1042). Mrs. F. insisted "My husband is not going to leave the home." (*Id.*) Gordon asked if she could think of "any other options" to "ensure [B.'s] safety while we're doing this investigation?" "And, [Mrs. F.] said, 'No.'" (*Id.*).

Gordon also recalled Mrs. F. repeating her decision a second time, stating: "No, [B.] will go. I'm not having [Mr. F.] leave." (*Id.* at 1045). Mrs. F. then began gathering the children's things in preparation for their stay in respite care.

Mrs. F.'s recollection of the exchange is similar to, but less specific than Gordon's. At her deposition, she testified as follows:

> A. Well, like I said, I went into the family room, I sat there for a while and [Gordon] came in. . . . I don't remember the whole conversation, but I know she had said . . . either your husband will have to leave or your kids will. And I stated that I was not going to ask [Mr. F.] to leave his own home.
>
> Q. You considered [Mr. F.] your priority?
>
> A. Yes.

3

> Q. Betsy Gordon told you didn't she that for safety purposes, they considered it important that there be a separation, true?
>
> A. Yes.
>
> Q. And she said, I see the alternatives as the children leaving or [B.] leaving or [Mr. F.] leaving. She said those were the alternatives that she could think of; isn't that true?
>
> A. An ultimatum, yeah.
>
> Q. And she asked you do you see any other options, didn't she?
>
> A. Yes.
>
> Q. Did you offer any other options?
>
> A. I wasn't thinking clearly at the time. No, I didn't, she didn't either.

(Doc. 43, ID 959-60).

Mrs. F. also concedes that she did not expressly object to B.'s removal while speaking to Gordon, Barth, Gandee or anyone else on the scene:

> Q. At any time during April 27, 2015, did you say this is wrong, [B.] should stay here with me?
>
> A. No.

(*Id.* at 965, 960-61).

Mr. F. returned home with A. and D. as Mrs. F. was gathering their belongings. He had been in contact with his wife via text message and already informed the foster children that they would have to leave the house, but assured them everything would be alright. By that point, the Hartlages and a number of other social workers had also arrived at the F. home, and defendants decided to place B. with Mr. and Mrs. Hartlage.

Like his wife, Mr. F. acknowledged during his deposition that he did not object to the removal arrangement outright:

> Q. Did you ask [Barth] or [Gordon] to explain what was going on with regard to the placement of the children?
>
> A. When I got in, the kids were leaving. The foster parents were there, all packed up and decisions had been made. . . .
>
> * * *
>
> Q. Did you propose any means by which that safety concern could be addressed?
>
> A. I did not.
>
> Q. And yet, of course, you knew based on what you told me earlier that if [Mrs. F.] remained in the house with the children, it would be a risky and difficult situation?
>
> A. I won't deny that.
>
> * * *
>
> Q. . . . You were about to say my wife made the decision[?]
>
> A. Yeah. [Mrs. F.] had made the decision, people were there, the clothes were packed, the kids were being shuffled off. Am I to publicly undermine my wife? I did not know what was going on, I'm telling you . . . I knew what the system would be, so that wasn't the time to object. The following day when I went to court would be the time to bring up my opinion. That never happened.

(Doc. 42, ID 586, 592-93, 594-95).

The post-removal hearing plaintiffs anticipated "never happened" because Gordon told Barth that Mrs. F. had agreed to B.'s removal into respite care as part of an out-of-home safety plan. And "when a parent voluntarily consents to [removal as part of] a safety plan, 'no hearing of any kind is necessary; hearings are required for deprivations taken over objection, not for steps authorized by consent.'" *Smith v. Williams-Ash*, 520 F.3d 596, 600 (6th Cir. 2008) (quoting *Dupuy v. Samuels*, 465 F.3d 757, 761–62 (7th Cir. 2006)).

Defendants contend that they first learned that plaintiffs objected to B.'s removal roughly two weeks later on May 11, 2015, when plaintiffs' attorney contacted Gordon and told her that

5

Mr. and Mrs. F. did not agree with the out-of-home safety plan. Gordon then filed the complaint necessary to trigger a prompt shelter care hearing in Ottawa County Juvenile Court.

Juvenile Court Judge Kathleen Geisler presided over the shelter hearing on May 13, 2015, but did not issue a ruling, as Mr. F. ultimately agreed to leave the home while OCDJFS completed its investigation.

Four months later, plaintiffs filed this suit against Gordon, Barth, and OCDJFS Director Stephanie Kowal, for violating their "right to prompt post-deprivation notice and hearing." (Doc. 1, ID 27).

**Discussion**

The main issue in this case is consent, as "a parent's voluntary consent to a safety plan obviates the need for any additional due process procedures on the part of the agency seeking to remove the child from a parent's custody." *Teets v. Cuyahoga Cty.*, 460 F. App'x 498, 503 (6th Cir. 2012) (citing *Smith*, *supra*, 520 F.3d at 600).

In their motion for summary judgment, defendants assert qualified immunity against plaintiffs' procedural due process claim. They contend first, that Gordon did not violate plaintiffs' constitutional rights because they voluntarily consented to B.'s removal, and second, that no reasonable social worker in Gordon's position would have known, based on plaintiffs' conduct, that they objected to the removal and expected a post-deprivation probable cause hearing.[2]

---

[2] Barth and Kowal also claim qualified immunity from suit, but the affidavit statements that defendants urge me to strike primarily involve plaintiffs' recollection of their interactions with Gordon.

Mr. and Mrs. F. seek to rebut the qualified-immunity defense though personal affidavits attached to their brief in opposition to defendants' summary-judgment motion. (*See* Docs. 79-1, 79-2).

Defendants move to strike those affidavits, claiming they are either: (1) contradicted by plaintiffs' sworn deposition testimony; (2) irrelevant; or (3) both.[3] Because defendants look to strike nearly every paragraph of plaintiffs' affidavits on these grounds, I discuss the relevant law first, then apply it to each disputed paragraph.

### Sham Affidavit Rule

Defendants first argue Mr. and Mrs. F.'s declarations are mere "sham affidavit[s]"–sworn statements that "directly contradict[], without explanation," their "previous testimony." *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 908 (6th Cir. 2006).

The rule against sham affidavits "is grounded on the sound proposition that a party should not be able to create a disputed issue of material fact" once she has given "earlier testimony . . . indicat[ing] that no such dispute exists." *Id.* at 907. However, determining whether an affidavit "is 'contradictory' to a pervious deposition for the purposes of admissibility at the

---

[3] Rule 56(c)(2) governs objections to the admissibility of evidence offered to support a factual assertion in a summary-judgment motion. The 2010 amendments to Rule 56 allow a party seeking, or opposing summary judgment to cite materials in the record, including "affidavits or declarations," even if "made for purposes of the motion only." Fed. R. Civ. P. 56(c)(1)(A). If the responsive party believes the materials cited "cannot be presented in a form that would be admissible in evidence," it may file an objection. Fed. R. Civ. P. 56(c)(2). "However, motions to strike are no longer appropriate under the 2010 amendments to Rule 56." *Smith v. Interim Health Care of Cincinnati*, 2011 WL 6012971, *4 (S.D. Ohio); *see also Stillwagon v. City of Delaware*, 274 F. Supp. 3d 714 (S.D. Ohio 2017). Instead, the Rule 56(c)(2) objection "functions much as an objection for trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike." Fed. R. Civ. P. 56(c) (2010 Advisory Committee Notes) "If a party does file a separate motion to strike, the motion should be construed as an objection under Rule 56(c)(2)," *Stillwagon*, *supra*, 274 F. Supp.3d 714, which is how I construe defendants' motion in this instance.

summary-judgment stage" calls for "a relatively narrow definition of a contradiction." *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006).

A post-deposition affidavit is not contradictory "merely because it conflicts to *some degree* with an earlier deposition." *Aerel*, 448 F.3d at 908 (citation omitted). Rather, I may disregard an affidavit statement only if it is in "clear, direct contradiction" of the party's deposition testimony, *Siewertsen v. Worthington Steel Co.*, 134 F. Supp.3d 1091, 1099 (N.D. Ohio 2015), or if the non-movant uses it "to create a sham issue of fact." *Aerel*, *supra*, 448 F.3d at 908.

"This is a far cry, however, from preventing a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit." *Id.* at 907.

**Relevance**

Defendants also maintain that many of Mrs. F.'s affidavit statements, particularly those in which she speculates about what she "would have" said, or "would have" done if defendants had "made [her] aware" that they considered B.'s removal consensual (*see* Doc. 79-2), should be excluded as irrelevant.

"Relevant evidence is admissible" at summary judgment and at trial, while "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Defendants' relevancy objection is tied to their qualified-immunity defense, and to plaintiffs' efforts to overcome it.

8

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Its applicability to an individual defendant "generally turns on the objective legal reasonableness of [her] action," as "assessed in light of the legal rules that were clearly established at the time" she took it. *Eugene D. By & Through Olivia D. v. Karman*, 889 F.2d 701, 705–06 (6th Cir. 1989) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (ellipsis omitted)).

Defendants' objection to Mrs. F.'s affidavit statements is grounded in the "objective legal reasonableness" element of the inquiry. "The objective legal reasonableness standard requires us to analyze whether a case worker in the social worker's position objectively would have understood that she was under an affirmative duty to have refrained from" the conduct that allegedly violated plaintiffs' rights. *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687, 698 (6th Cir. 2013) (brackets and citation omitted).

Under this "wholly objective standard," *Wyatt v. Cole*, 504 U.S. 158, 166 (1992) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)), I may "consider[] only the facts that were knowable to the defendant officers" at the time they acted. *White v. Pauly*, __ U.S.__, 137 S. Ct. 548, 550 (2017); *see also*, *e.g.*, *Jordan v. Murphy*, 145 F. App'x 513, 517 (6th Cir. 2005) (assessing social worker's actions based on "the information [she] had received through her agency," and "the police officers' observations and conclusions" upon which she relied); *J.R. v. Gloria*, 599 F. Supp.2d 182, 202 (D. R.I. 2009) ("Reasonableness is judged in light of all the information [the] Defendant[] [social workers] possessed" at the time of their decision).

### Mrs. F.'s Affidavit

In paragraph two of her affidavit, Mrs. F. attests:

> At no time on April 27, 2015, did Betsy Gordon, Julie Barth . . . or any other person indicate to me in any way that the removal of my adopted daughter B. . . . was part of a safety plan or respite care. If Gordon, Barth or Gandee . . . had made me aware that they considered the removal of B. . . . to be pursuant to my consent, I would have quickly informed them that I did not consent, and I would have in fact objected. But at no time was I informed that I had any option to consent or withhold consent to a safety plan or respite care. Rather, I was only told by Gordon that B. . . . would be removed from the house unless my husband . . . agreed to leave the house.

(Doc. 79-2, ¶ 2).

Defendants dispute each sentence in this paragraph.

For starters, they point out that Mrs. F. admitted in her deposition that Gordon did, in fact, tell her that B. had to be removed from the home for "safety" purposes, which is correct. But Mrs. F. admitted only that Gordon cited safety as a reason for the removal; she did not admit that Gordon specifically mentioned a "safety plan" or respite care during their discussion.

This is a distinction with a difference. "Safety plan" and "respite care" are specifically defined terms under Ohio law and thus presumably part of a child welfare worker's routine lexicon. *See* Ohio Admin. Code 5101:2-1-01(B)(154), (201), (271), (275) (defining "safety plan," "in-home" and "out-of-home" safety plans, and "respite care"). Regardless of any putative familiarity with these terms, Mrs. F. did not concede that Gordon used them. Accordingly, this is not a "clear, direct contradiction" of her deposition testimony, *Siewertsen*, *supra*, 134 F. Supp.3d at 1099, and I overrule defendants' objection to the first sentence of paragraph two.[4]

I will however, disregard the remainder of paragraph two insofar as it describes actions Mrs. F. believes she "would have" taken under different circumstances. What Mrs. F. "would

---

[4] I reject defendants' objection to the second sentence of paragraph three, paragraph four in its entirety, and the first sentence of paragraph nine, for the same reason.

have" done if defendants had made different statements regarding B.'s removal is irrelevant, and "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402.[5]

Defendants next dispute the opening sentence to paragraph three, in which Mrs. F. attests:

At no time on April 27, 2015, did I in any way indicate consent to having my daughter . . . B. . . . removed from the family home.

(Doc. 79-2, ¶ 3).

Contrary to that assertion, Mrs. F. admitted in her deposition that she did take certain actions that an objective observer might view as "indicat[ing] consent" to B.'s removal. Mrs. F. testified that when Gordon asked whether B. or Mr. F. should leave during the investigation, she "stated that [she] was not going to ask [Mr. F.] to leave his own home," began gathering the children's things, and gave Gordon no other options when asked if she could think of any alternative arrangements.

Moreover, because plaintiff's affidavit denial is so broadly-worded–claiming she did not, "in *any way* indicate" consent to B.'s removal–she directly contradicts deposition testimony recounting actions that a reasonable social worker could, "in any way" interpret as consent. I therefore sustain defendants' objection to this affidavit statement and disregard this sentence.

I likewise sustain defendants' objection to paragraph five of Mrs. F.'s affidavit, stating:

The fact that I was not going to send my children out without any clothing or medications, and that I therefore gathered up clothing and medications and the like, had nothing to do with consent, but everything to do with loving my children and foster children, and it is beyond me how any rational person could believe

---

[5] I have expressed the same view elsewhere: "Speculation as to whether [a party] would have asserted its rights, and whether it would have done so skillfully, is simply not relevant." *QSI-Fostoria DC, LLC v. General Elec. Capital Business Asset Funding Corp.*, 2007 WL 2460345, *4 (N.D. Ohio).

I will likewise disregard the last sentence of paragraph eight, and second and third sentences of paragraph nine for the same reason.

11

that simply ensuring that one's child would be adequately dressed and medicated when removed from my protection, would constitute consent to their removal.

(Doc. 79-2, ¶ 5).

Regardless of what Mrs. F.'s subjective intent may have been when she gathered the children's things, she admittedly did not express it to Gordon, or anyone else on the scene.

Plaintiff's unstated thoughts were not "knowable" to defendants, *White*, *supra*, 137 S. Ct. at 550, and are not relevant. Further, her insistence that no "rational" social worker could have interpreted her actions as evincing consent borders on impermissible legal opinion. *See Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) ("At the summary judgment stage . . . the question whether [the defendants'] actions were objectively unreasonable is 'a pure question of law.'"(quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007))). Paragraph five is irrelevant, and therefore inadmissible.

Paragraph six suffers from a similar failing. There, Mrs. F. states:

The reason I did not express objections to Betsy Gordon or to anyone else removing B. . . . from our home was because once I refused to throw my husband out of his own home, I was told by Gordon that the removal of B. . . .was going to happen, period, and it had been made clear to me that any objection would fall on deaf ears.

(Doc. 79-2, ¶ 6).

Regardless of the reasons Mrs. F. "did not express [her] objections," the fact is she did not express them. Thus, Gordon was unaware of Mrs. F.'s unspoken objections, and they play no role in judging the reasonableness of her actions.

What is more, Mrs. F.'s statement in paragraph six arguably poses a "clear" and "direct contradiction" to her deposition testimony. *Siewertsen*, *supra*, 134 F. Supp.3d at 1099.

During her deposition, Mrs. F. acknowledged that Gordon asked whether she could think of any "other options" to facilitate B.'s separation from Mr. F., short of further intervention by

12

Ottawa County. Plaintiff did not offer any. Nor did she give Gordon the names of any family members who may have been willing to take B. in during the investigation. (*See* Doc. 43, ID 960-61). This testimony undercuts plaintiff's assertion that Gordon told her B.'s removal was "going to happen," and her claimed belief that "any objection would [have] fall[en] on deaf ears."

Accordingly, I sustain defendants' objections to paragraphs five and six in their entirety.

Defendants also challenge paragraph eight, wherein Mrs. F. attests:

> Contrary to the suggestion in Defendants' [summary-judgment brief], at no time did I express willingness to go along with any safety plan or respite care, because it was never indicated to me that the children had been removed from our . . . home pursuant to any such plan. Rather, I had been told in unequivocal terms that if I were not willing to remove my husband . . . from the family home, that B. . . . WOULD be removed, and I had no choice about it. At no time did I ever consent to B.['s] removal, nor was her removal ever put to me in terms of being consensual.

(Doc. 79-2, ¶ 8).

Defendants claim this paragraph contradicts Mrs. F.'s testimony regarding her actions subsequent to B.'s removal.

On May 1, 2015, for example, four days after the removal, Kowal visited Mr. and Mrs. F. and asked them to complete a respite care packet to entrust B. into Adriel's care. Mrs. F. signed the form, which put plaintiffs on explicit notice that the nature of B.'s removal was a respite care placement. Kowal also gave Mr. F. an application to a fund program that could help plaintiffs offset the cost of B.'s stay in respite care with the Hartlages, which he signed apparently without objection, except to ask Kowal whether B. could return home in the event that he left the house.[6]

---

[6] Plaintiffs were responsible for the respite care costs because they still had legal custody of B. Given their belief that Mr. and Mrs. F. had consented to their daughter's removal, defendants did not yet file the complaint necessary to take temporary legal custody of B. in Juvenile Court.

Although she testified that she signed the respite care packet only to "be compliant with Ottawa County," (Doc. 43, ID 971), Mrs. F. admitted that at the time, she did not voice any objections to Kowal:

> Q. And did you tell [Kowal] on May 1st that it was wrong that [B.] was out of your home and you wanted her returned?
>
> A. No.
>
> Q. Did you tell her we don't agree or consent to the current arrangement?
>
> A. No.

(*Id.* at 974).

I agree that paragraph eight squarely contradicts Mrs. F.'s deposition testimony conceding that she signed the respite care packet.

Notably, in this paragraph, Mrs. F. does not limit herself to the discussion she had with Gordon on the date of the removal–April 27, 2015. Instead, she attests that "at no time" did she ever "express willingness to go along with" a respite care plan, and claims defendants "never indicated to [her]" that they removed B. pursuant to a respite care plan.

Yet, according to her own deposition testimony, that is not true.

Defendants *did* "indicate[]" to plaintiffs that they removed B. under a respite care plan when Kowal brought them the respite care packet on May 1, 2015. And Mrs. F. did "express willingness" to go along with the removal when she signed the packet. I therefore sustain defendants' objection to this first sentence.

The second and third sentences, on the other hand, are not so contradictory to plaintiff's deposition testimony as to warrant exclusion.

Mrs. F. testified that Gordon gave her a choice between Mr. F. leaving, or B. leaving– making the second sentence consistent with that testimony. Additionally, while Mrs. F.'s

14

signature on the respite care packet may ultimately undermine her claim that she "[a]t no time . . . ever" consented to B.'s removal, her deposition testimony does not itself betray such a contradiction. Consequently, the sham affidavit rule does not apply.

I therefore overrule defendants' objection in this regard.

### Mr. F.'s Affidavit

Finally, defendants object to paragraph four of Mr. F.'s affidavit, largely for the same reasons they object to his wife's affidavit.

There, Mr. F. states:

> At no time did I ever revoke consent to a safety plan, because at no time was I ever informed that B. . . was removed pursuant to a safety plan. Had I been asked whether I consented to B.['s] removal pursuant a safety plan, or had I even been informed that she was being removed pursuant to a safety plan, I would have expressly objected to her removal. But I was never asked or so informed.

(Doc. 79-1, ¶ 4).

The analysis here is also largely the same.

Like his wife, Mr. F. conceded in his deposition that he understood defendants were removing B. for safety purposes, but never testified that defendants specifically informed him they were removing her pursuant to a "safety plan." Paragraph four thus does not "clear[ly]" or "direct[ly]" contradict Mr. F.'s deposition testimony *Siewertsen*, *supra*, 134 F. Supp.3d at 1099, and I will not exclude it under the sham affidavit rule.

I will, however, sustain defendants' objection to paragraph four insofar as it discusses what Mr. F. "would have" said if defendants had expressly mentioned a safety plan. Again, what plaintiffs "would have" done under different circumstances is irrelevant. "Irrelevant evidence is not admissible." Fed. R. Evid. 402.

15

## Conclusion

It is, therefore,

ORDERED THAT defendants' motion to strike the affidavits of Mr. and Mrs. F. (Doc. 81) be, and the same hereby is, granted in part and denied in part, as provided herein.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge