# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

P.F., et al.,                                          Case No. 3:15CV1923

            Plaintiffs

        v.                                      **ORDER**

Betsy Gordon, et al.,

            Defendants

In this case under 42 U.S.C. § 1983, plaintiffs Mr. and Mrs. F. accuse defendants, employees of the Ottawa County, Ohio, Department of Job and Family Services (OCDJFS), of violating their procedural due process rights based on defendants' removal of their daughter, B., from their home after B alleged that Mr. F. physically and sexually abused her.

Pending is defendants' motion for summary judgment (Doc. 77), which plaintiffs oppose (Doc. 79). For the reasons that follow, I grant the motion.

## Background[1]

Mr. and Mrs. F. are the adoptive parents of B., a teenaged daughter, and foster parents to two younger children, son D. and daughter A.

On April 27, 2015, defendant Julie Barth, a supervisor in the Children's Services Division, received an intake report detailing B.'s abuse complaint against her father. Barth assigned the matter to defendant caseworker Betsy Gordon. She and Barth reviewed the

---

[1] I take this summary from my order granting in part and denying in part defendants' motion to strike, *P.F. v. Gordon*, 2018 WL 2149280 (N.D. Ohio 2018), but have added additional facts relevant to resolving defendants' dispositive motion.

complaint and reported the matter to the Adriel School, the organization through which Mr. and Mrs. F. received their foster parent licenses, and to the Ottawa County Sheriff's Office.

Barth and Gordon[2] then went to the F. home to speak with B. and her parents. With them was Ottawa County Deputy Sheriff Gandee. B. answered the door when they arrived. Mrs. F. was at home but Mr. F. was at a soccer game with A. and D.

Gordon spoke to Mrs. F. while Gandee and Barth spoke with B. privately, in a separate room. Gordon explained B.'s allegations against her father; Mrs. F. relayed that her daughter had a history of sexual addiction and traumatization. Meanwhile, B. reiterated her complaints to Gandee and Barth. Her account was consistent with her initial complaint.

At some point, Gordon stepped outside to call personnel at child welfare agencies in Lucas and Allen Counties, which had legal custody of the younger foster children. Both agencies told Gordon that they would place A. and D. in "respite care" outside the F. home pending the outcome of the investigation into B.'s claims. Gordon also called Adriel, which worked with Allen County to find a respite care home for A., with a Mr. and Mrs. Hartlage. The Hartlages expressed a willingness to take B. if necessary.

Once back inside the house, Gordon spoke to Mrs. F. to determine how to proceed. What was or was not said during their exchange is at the center of this suit.

According to Gordon, she "explained to [Mrs. F.] what Lucas County and Allen County had decided," then expressed her "concerns about [B.] remaining in the home with [Mr. F.] during the pendency of this investigation." (Doc. 44, ID 1042).

---

[2] Barth and Gordon decided to investigate the matter together because Gordon and B.'s father have a prior working relationship. Mr. F. is himself a licensed social worker, and a former caseworker in the Children's Services Division of OCDJFS.

2

Gordon believed separating B. and Mr. F. "would protect [B.] from any other real or perceived abuse" and "protect [Mr. F.] from any further allegations." (*Id.* at 1043). It would also negate any suggestion that B. was "being coerced or intimidated" by her parents in the event that she rescinded or changed her claims. (*Id.* at 1043-44). "And given the history . . . of [B.'s] violence toward [Mr. F.], it would protect them, the parents, from any physical anger outbursts by [B.] at this time." (*Id.* at 1044).

With these issues in mind, Gordon told Mrs. F. that she had "two options: that [Mr. F.] could leave the home while the agency was investigating, or that [B.] could leave the home while the agency was investigating." (*Id.* at 1042). Mrs. F. insisted, "My husband is not going to leave the home." (*Id.*). Gordon asked if she could think of "any other options" to "ensure [B.'s] safety while we're doing this investigation?" "And, [Mrs. F.] said, 'No.'" (*Id.*).

Gordon also recalled Mrs. F. repeating her decision a second time, stating: "No, [B.] will go. I'm not having [Mr. F.] leave." (*Id.* at 1045). Mrs. F. then began gathering the children's things in preparation for their stay in respite care.

Mrs. F.'s recollection of the exchange is similar to, but less specific than, Gordon's. At her deposition, she testified as follows:

> A. Well, like I said, I went into the family room, I sat there for a while and [Gordon] came in. . . . I don't remember the whole conversation, but I know she had said . . . either your husband will have to leave or your kids will. And I stated that I was not going to ask [Mr. F.] to leave his own home.
>
> Q. You considered [Mr. F.] your priority?
>
> A. Yes.
>
> Q. Betsy Gordon told you didn't she that for safety purposes, they considered it important that there be a separation, true?
>
> A. Yes.

3

> Q. And she said, I see the alternatives as the children leaving or [B.] leaving or [Mr. F.] leaving. She said those were the alternatives that she could think of; isn't that true?
>
> A. An ultimatum, yeah.
>
> Q. And she asked you do you see any other options, didn't she?
>
> A. Yes.
>
> Q. Did you offer any other options?
>
> A. I wasn't thinking clearly at the time. No, I didn't, she didn't either.

(Doc. 43, ID 959-60).

Mrs. F. also concedes that she did not expressly object to B.'s removal while speaking to Gordon, Barth, Gandee or anyone else on the scene:

> Q. At any time during April 27, 2015, did you say this is wrong, [B.] should stay here with me?
>
> A. No.

(*Id.* at 965, 960-61).

Barth – who was still in another room with B. and Deputy Gandee – was not present for Gordon's conversation with Mrs. F. She understood, however, from her later conversation with Gordon that Mrs. F. had consented to B.'s removal. (Doc. 45, ID 1546-48).

Mr. F. returned home with A. and D. as Mrs. F. was gathering their belongings. He had been in contact with his wife via text message and already told the foster children that they would have to leave the house, but assured them everything would be alright. By that point, the Hartlages and a number of other social workers had also arrived at the F. home, and defendants decided to place B. with Mr. and Mrs. Hartlage.

Mr. F. also understood, by that point, that B. had made an abuse allegation against him, and he offered to "take a polygraph" to disprove her claim when he first approached Gordon. (Doc. 42, ID 585). Like his wife, however, Mr. F. acknowledged that he did not object to the removal arrangement outright:

> Q. Did you ask [Barth] or [Gordon] to explain what was going on with regard to the placement of the children?
>
> A. When I got in, the kids were leaving. The foster parents were there, all packed up and decisions had been made. . . .
>
> \* \* \*
>
> Q. Did you propose any means by which that safety concern could be addressed?
>
> A. I did not.
>
> Q. And yet, of course, you knew based on what you told me earlier that if [Mrs. F.] remained in the house with the children, it would be a risky and difficult situation?
>
> A. I won't deny that.
>
> \* \* \*
>
> Q. . . . You were about to say my wife made the decision[?]
>
> A. Yeah. [Mrs. F.] had made the decision, people were there, the clothes were packed, the kids were being shuffled off. Am I to publicly undermine my wife? I did not know what was going on, I'm telling you . . . I knew what the system would be, so that wasn't the time to object. The following day when I went to court would be the time to bring up my opinion. That never happened.

(Doc. 42, ID 586, 592-93, 594-95).

The post-removal hearing plaintiffs anticipated "never happened" because Gordon told Barth that Mrs. F. had agreed to B.'s removal into respite care as part of an out-of-home safety plan. And "when a parent voluntarily consents to [removal as part of] a safety plan, 'no hearing

5

of any kind is necessary; hearings are required for deprivations taken over objection, not for steps authorized by consent.'" *Smith v. Williams-Ash*, 520 F.3d 596, 600 (6th Cir. 2008) (quoting *Dupuy v. Samuels*, 465 F.3d 757, 761–62 (7th Cir. 2006)).

The next day, Gordon informed the Director of OCDJFS, defendant Stephanie Kowal, about B.'s allegations and the plans to keep B. and Mr. F. separated during the investigation.

Regarding Mrs. F., Gordon reported, "she was not going to be asking her husband to leave the home, that [Gordon] had asked if [Mrs. F.] had any other suggestions or any other family or friends that could take [B.], that [Mrs. F.] didn't give her any suggestions and that [Gordon] suggested that a respite be used instead." (Doc. 46, ID 1828).

Under the respite care plan, plaintiffs would keep legal custody of B., but would also be responsible to pay for the out-of-home placement. To help with the expense, Kowal suggested providing plaintiffs with an application for Emergency Social Services Allocation Family Preservation Dollars (ESSA), a funding program "that makes money available to help families offset costs that are incurred in preventing a family separation." (Doc. 77-1, ID 3067; Doc. 46, ID 1827-28).

On May 1, four days after the removal, Kowal visited Mr. and Mrs. F. to discuss financial options. During their meeting, Mr. F. signed and completed the ESSA form, specifying that he and his wife were applying for funds for "respite care of [B.], up to 30 days." (Doc. 42-1, ID 811; Doc. 42, ID 620-21).

Kowal also gave the couple a "respite packet" from Adriel, including a "Respite Information" form, a "Right to Treat" form, a "Consent to Treat" agreement, a "Medical Insurance Coverage" agreement and a "Financial" agreement. (Doc. 43-1, ID 993).

Mrs. F. completed the packet, putting her on notice that she, "being the legal guardian of" B., had "entered into an agreement with Adriel Foster Care and Adoption, Inc. . . . under the terms of which [she] ha[d] entrusted to its care their [*sic*] ward, and under the terms of which the Adriel has accepted such care." (Doc. 43-1, ID 996). The packet further specified that she, "[a]s the parent/guardian of" B., authorized Adriel to give her emergency or other medical treatment as needed. (*Id.* at 995, 998).

Again, neither Mrs. nor Mr. F. objected to B.'s removal at that time.

Before Kowal left, Mr. F. asked her whether the children could return home if he agreed to leave the house. (Doc. 42, ID 615). Kowal told him to take the issue up with Gordon, though evidently, he never did. (*Id.* at 616).

On May 5, Barth spoke to Mr. F. by phone to inform plaintiffs that OCDJFS may have to move B. to a different respite care home. (Doc. 42, ID 626-27). Barth's notes indicate that during the phone call, she again "explained that because the agency did not have custody and because he and [Mrs. F.] were cooperating with the investigation and understood that B. cannot stay at home during the investigation, that the arrangements were made for the parents to voluntarily respite B. with the Hartlages." (Doc. 45, ID 1635-36).

Mr. F. testified that he had no memory of the call one way or the other. Barth's impression, however, is that he was "cordial," "seemed to understand everything," and was "absolutely" in agreement with the plan. (*Id.* at 1636).

On May 11 – roughly two weeks after B.'s removal – plaintiffs' attorney contacted Gordon and told her that Mr. and Mrs. F. did not agree with the out-of-home safety plan. Gordon immediately filed the complaint necessary to trigger a prompt shelter-care hearing in Ottawa

County Juvenile Court, and on May 12 the court issued an ex parte order authorizing OCDJFS to take temporary emergency custody of B.

Juvenile Court Judge Kathleen Geisler presided over the shelter hearing the next day. The judge did not issue a ruling, however, because Mr. F. agreed to leave the home while OCDJFS completed its investigation.

Four months later, plaintiffs filed this suit against Gordon, Barth and Kowal for violating their "right to prompt post-deprivation notice and hearing." (Doc. 1, ID 27).

## Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323. Once the movant carries its burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the nonmovant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## Discussion

Section 1983 provides a cause of action against a state actor who deprives an individual of his or her constitutional rights. For parents, those rights include a protected liberty interest "in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

8

State authorities cannot interfere in the parent-child relationship without first affording a parent due process of law. *Smith*, *supra*, 520 F.3d at 599. In many cases, this means "[n]otice and an opportunity to be heard are necessary before parental rights can be terminated." *Id.* (citation omitted). "But," if the state has reason to believe "a child's safety is threatened, that is justification enough for action first and a hearing afterward." *Dupuy v. Samuels*, 465 F.3d 757, 760 (7th Cir. 2006) (citation omitted).

"[E]ven for temporary deprivations of custodial rights," however, "parents are generally entitled to a hearing within a reasonable time." *Teets v. Cuyahoga Cnty.*, 460 F. App'x 498, 503 (6th Cir. 2012) (internal quotation marks omitted).

Plaintiffs contend that Gordon, Barth, and Kowal violated their procedural due process rights by denying them the requisite "post-deprivation" hearing. (Doc. 1, ID 27).[3]

Defendants respond they did not have to initiate the post-removal hearing process because Mr. and Mrs. F. had consented to B's removal and the safety plan. Such consent, defendants contend, "obviates the need for any additional due process procedures on the part of the agency seeking to remove the child from a parent's custody." *Teets*, *supra*, 460 F. App'x at 503. And because "'a safety plan is voluntary, no hearing of any kind [wa]s necessary.'" *Petty v. Dep't of Human Servs.*, 2017 WL 1483338, *3 (N.D. Okla. 2017) (quoting *Dupuy*, *supra*, 465 F.3d at 761 (brackets omitted)).

---

[3] Plaintiffs allege only a procedural due process claim, not a substantive due process claim. (Doc. 1, ¶¶ 15, 16, 19-25). And although plaintiffs refer to their relationship with all three children throughout their brief in opposition, the procedural due process claim, as they have pleaded it, arises only from their relationship with B., their adopted daughter over whom they had legal custody. (*Id.*). Mr. and Mrs. F. acknowledged that because A. and D. are foster children, Lucas and Allen Counties had authority to place them elsewhere during the investigation. Finally, plaintiffs agree that their claim rests solely on an alleged "lack of post-deprivation process, including the absence of a hearing the day immediately following" B.'s removal, not defendants' decision to remove B. before obtaining court order. (Doc. 79, ID 3091).

Gordon, Barth, and Kowal also assert the defense of qualified immunity, which "protects government officials from liability . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). My analysis of this defense is two-pronged: I decide whether the official's conduct violated a constitutional right and whether that right was clearly established at the time of the alleged violation. *Id.* at 232. If the claim fails at one prong, I need not address the other. *Id.* at 236.

### A. Gordon

### 1. No Constitutional Violation

As already discussed, "when a parent voluntarily consents to [removal as part of] a safety plan, no hearing of any kind is necessary; hearings are required for deprivations taken over objection, not for steps authorized by consent." *Smith*, *supra*, 520 F.3d at 600. Even if a parent "felt coerced" to consent to a safety plan, moreover, "that fact alone is not enough to establish that the safety plan was involuntary." *Teets*, *supra*, 460 F. App'x at 503.

In this case, the undisputed evidence establishes that Mr. and Mrs. F. consented to B.'s removal from the home as part of a safety plan. No rational fact-finder could find otherwise.

Gordon testified that she explained Mrs. F.'s "two options": either B. could leave or Mr. F. could leave pending the investigation. According to her own testimony, Mrs. F. affirmed that she "was not going to ask [Mr. F.] to leave his home." She then gathered the children's items in preparation for their stay out of the home. Mrs. F. did not object to B.'s removal, nor did she give Gordon other options when asked if she could think of any alternative arrangements.

When Mr. F. arrived home, he too indicated he understood what was going on, even offering to "take a polygraph" test. Nevertheless, he testified that he did not want to "undermine"

his wife, and chose not to object. Notably, Mr. F. was himself a licensed social worker who had once worked in the Children's Services Division of OCDJFS.

After B. left the F. home as part of the safety plan, moreover, both Mr. and Mrs. F. had additional opportunities to object. Rather than object, however, plaintiffs gave the impression that they were in agreement with the safety plan.[4]

On May 1, 2015, for example, Mr. F. signed paperwork indicating that he was applying for funds to pay for "respite care of [B.], up to 30 days." (Doc. 42-1, ID 811; Doc. 42, ID 620-21). For her part, Mrs. F. completed a packet of paperwork established her agreement to "entrust" B. "to [the Adriel House's] care." (Doc. 43-1, ID 996).

Only on May 11, about two weeks after B.'s removal, did plaintiffs object to the safety plan. This, in turn, caused Gordon to repair to the Ottawa County Juvenile Court, where she secured the order authorizing OCDJFS to take temporary emergency custody of B.

Even viewed in the light most favorable to Mr. and Mrs. F., the undisputed evidence permits only one rational conclusion: the plaintiffs consented to placing B. with a foster family pending the investigation into B.'s abuse claims. For that reason, the failure to afford plaintiffs a post-removal hearing was not a procedural due process violation. *Smith*, *supra*, 520 F.3d at 600.

### 2. No Violation of Clearly Established Law

Gordon is also entitled to qualified immunity because a reasonable person in her position should not have understood that she in fact lacked the plaintiffs' consent to remove B. from the home.

---

[4] It is true that Jeff Hartlage, who took respite care of A. and B., testified that he remembered Mr. F. objecting to B.'s removal. (Doc. 48, ID 2117-20). This testimony does not create a genuine issue of material fact because not even Mr. F. claims that he objected. Indeed, plaintiffs' entire theory of the case presumes that there was no objection, which, in plaintiffs' view, made Gordon's actions illegal since she had no basis to believe there was consent.

11

Plaintiffs emphasize several facts that, in their view, establish that they had not consented.

They observe that neither Mr. F. nor Mrs. F. gave express or written consent to the safety plan. Plaintiffs also contend that, because Gordon never used the phrase "safety plan," they did not know that B.'s removal was part of a safety plan (as opposed to a component of some other government-sanctioned removal proceeding). Finally, plaintiffs cite the various reasons, including Mr. F.'s belief that a hearing would occur shortly after the removal, why they did not voice an objection to B.'s removal.

These contentions cannot overcome the defense of qualified immunity because plaintiffs cite no case law on the books as of April, 2015 that clearly apprised Gordon that her conduct was illegal.

First, while plaintiffs frame their claim as the denial of a post-deprivation hearing, the critical issue in the case is whether Gordon had consent to remove B. from the F. home, which would have obviated the need for a post-deprivation hearing.

As I have explained, the evidence conclusively establishes that Gordon had the plaintiffs' implied consent: she gave Mrs. F. an ultimatum (either Mr. F. leaves the home or B. does); Mrs. F. insisted that her husband was not going anywhere; and Mrs. F. began packing up her kids' belongings. Thereafter neither she nor Mr. F. objected in any way, despite the obvious incentive to do so, and Gordon inferred and understood that the plaintiffs had consented.

There is no case law, moreover, establishing that Gordon could not infer consent from plaintiffs' behavior and, particularly, their failure to raise an objection when the situation called for them to do so.

Stated another way, the law did not then, and does not now, clearly establish that that Mr. and Mrs. F.'s consent had to be "express" or in writing. To the contrary, the law clearly establishes that consent may authorize government conduct that is otherwise impermissible without a warrant, court order, or other process. *E.g.*, *U.S. v. Little*, 431 F. App'x 417, 420-21 (6th Cir. 2011) (inferring defendant's consent to police officer's entry into a house).

Second, plaintiffs likewise cite no case law that would inform a reasonable caseworker that her failure to use the specific phrase "safety plan" invalidated plaintiffs' consent to B.'s removal.

As was true in *Petty*, *supra*, 2017 WL 1483338 at *5, the parties here "have not produced, and the court has not uncovered, any precedent that . . . imposes *Miranda*-style prophylactic warnings prior to waiver of a due process hearing[.]" Nor have I found any case discussing the specifics of what a social worker in Gordon's position must say to parents before the social worker can infer that the parents have consented to a removal.

Third, the plaintiffs' subjective beliefs about what was happening and why they did not object to B.'s removal are not relevant under the qualified-immunity standard.

Under that "wholly objective standard," *Wyatt v. Cole*, 504 U.S. 158, 166 (1992), I may "consider[ ] only the facts that were knowable to the defendant[s]" at the time they acted. *White v. Pauly*, --- U.S. ---, 137 S. Ct. 548, 550 (2017); *see also*, *e.g.*, *Jordan v. Murphy*, 145 F. App'x 513, 517 (6th Cir. 2005) (assessing social worker's actions based on "the information [she] had received through her agency," and "the police officers' observations and conclusions" upon which she relied); *J.R. v. Gloria*, 599 F. Supp.2d 182, 202 (D.R.I. 2009) ("Reasonableness is judged in light of all the information [the] Defendant[] [social workers] possessed" at the time of their decision).

Here the plaintiffs testified that they never objected when Gordon decided to separate B. and Mr. F. Rather, the plaintiffs agreed that the separation was appropriate and, given Mrs. F.'s insistence that Mr. F. would not leave the house, behaved as if they had consented to B.'s removal. In these circumstances, a reasonable social worker would have no basis to think that the plaintiffs had objected to the removal.

For all of these reasons, Gordon is entitled to qualified immunity.

### B. Barth and Kowal

Plaintiffs' claims against Barth, who was present during the removal, and Kowal, who was not, fail for essentially the same reasons.

Barth did not engage directly with either Mr. or Mrs. F. while she was at the F. home; rather, she relied on Gordon's summary of her interactions with the plaintiffs, including Gordon's note that Mrs. F. "was in agreement with the kids going on respite." Barth also testified that her observations of the plaintiffs' behavior on April 17, 2015 was consistent with their having consented to B.'s removal.

Kowal, too, relied on Gordon's account of what had transpired at Mr. and Mrs. F.'s home. When, several days after B.'s removal, Kowal went to plaintiffs' home to discuss the situation, Mr. and Mrs. F.'s actions – completing the paperwork related to securing funding for the respite care – were consistent with their having consented to the safety plan.

Plaintiffs have not cited any evidence, moreover, tending to suggest that either Barth or Kowal knew something that should have caused them to question Gordon's account of events or her conclusion that they consented to B.'s removal.

Accordingly, no basis exists for a reasonable jury to find that these defendants violated plaintiffs' due-process rights by denying them a post-deprivation hearing. *Combs v. Wilkinson*,

315 F.3d 548, 558 (6th Cir. 2002) ("Because plaintiffs fail to present any evidence that Wilkinson, who was not even present . . . on the evening of the disturbance, engaged in active unconstitutional behavior, we affirm the summary judgment in his favor."). Nor is there any clearly established law informing Barth and Kowal that they or Gordon had to do something more to ensure that plaintiffs had, in fact, consented to the safety plan.

For both reasons, Barth and Kowal are entitled to summary judgment.

## Conclusion

It is, therefore,

ORDERED THAT the defendants' motion for summary judgment (Doc. 77) be, and the same hereby is, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge